607 So.2d 43 (1992)
Loretta K. PIERRE
v.
STATE of Mississippi.
No. 89-KA-0860.
Supreme Court of Mississippi.
July 29, 1992.
*45 Ellen C. Bonner, Gulfport, for appellant.
Michael C. Moore, Atty. Gen., Mary Margaret Bowers, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before HAWKINS, P.J., and PRATHER and McRAE, JJ.
PRATHER, Justice, for the Court:

I. INTRODUCTION
This murder case arose on the appeal of Loretta Kaye Pierre from a February 3, 1989 conviction and life sentence imposed by the Circuit Court of Harrison County. The appellant timely filed a notice of appeal and raises the following issues:
A. Whether the prosecution overzealously prosecuted Pierre.
B. Whether the trial court erred when it discharged a juror for cause over the defendant's objection.
C. Whether the trial court erred when it denied the appellant's motion for mistrial when the state introduced testimony that the appellant signed an acknowledgement of her constitutional rights.
D. Whether the trial court erred when it admitted confessions.
1. Whether the trial court erred when it allowed into evidence the recorded confession made at the police department.

2. Whether the trial court erred when it allowed into evidence without *46 a hearing the confession Pierre made while on the telephone with her brother and which a police officer overheard.

3. Whether the trial court erred when it failed to grant the appellant an evidentiary hearing on a confession Pierre made to Loren Dingli, a cab driver.
E. Whether the trial court erred when it admitted a prior recorded statement of Sherman Carter.
F. Whether the trial court erred when it refused to allow evidence of the victim's drug usage.
G. Whether the trial court erred when it failed to grant a directed verdict or motion for new trial.
This Court finds no reversible error. Therefore, the conviction is affirmed.

Facts
In August, 1985, the defendant, Loretta Pierre, and Sherman Carter became estranged after a relationship of several years. Pierre moved from Carter's house, and Kathy Schweinsberg, the victim, eventually moved into Carter's home.
On the evening of December 20, 1985, Pierre made two visits to Carter's house. During the first visit, Schweinsberg pinned Pierre to the floor during a fight. Very early the next morning, cab driver Peggy Zielinski, who knew Pierre, drove Pierre to Carter's cottage. Carter and Schweinsberg were present, and Pierre talked with them.
There are two versions of the events of Schweinsberg's death. According to Pierre's confessions and Carter's statement, around 6:30 a.m., Pierre picked up a shotgun she knew Carter kept, chambered a shell, and shot Schweinsberg in the back, the pellets penetrating Schweinsberg's vital organs. Schweinberg fell onto Carter, who lay on the couch. He awoke and saw Pierre standing near the bedroom doorway, pointing the shotgun toward the couch. Carter rose, laid Schweinberg on the couch, and took the gun from Pierre.
Since Carter had no phone, Pierre went next door to ask a neighbor to summon help for someone who had been shot. Officer Gerald Nelson arrived on the scene. Carter, agitated and red-eyed, answered the door. Carter had no blood on his clothes.
Schweinsberg lay face down on the couch, head pointing north, a bloodied white towel on her back. Pierre sat smoking a cigarette nearby on an ottoman. Carter showed Nelson the gun.
Rescue workers who entered behind Nelson and Carter attended Schweinsberg. The rescue workers found little external bleeding but no palpable blood pressure, indicating internal bleeding. The workers discovered a one-and-a-half inch hole in her lower back. The medical workers placed the victim on a backboard on the floor. Medical examiner Dr. Bennett testified that, had Schweinsberg been lying on her back, she would have bled externally a great deal. In addition to internal damage, an autopsy revealed bruises several hours to three days old on the victim's face and mouth.
Pierre remained calm, on the ottoman. Carter continually inquired after Schweinsberg, and had to be urged to stay out of the way by Officer Nelson.
At one point, Pierre exclaimed within the paramedics' hearing, "I shot her and I will do it again." Pierre corroborated the paramedic's testimony and admitted having said this. On cross-examination, Pierre denied having said, as she testified in an earlier mistrial, "I shot her and if she was still alive, I'd do it again." Officer Nelson arrested Pierre for aggravated assault and "Mirandized" her.[1]
According to Pierre's current version of events, when she returned to the cottage, Carter asked to speak to her alone. She claimed she found Carter and Schweinsberg tense and arguing. Pierre went to the bathroom, heard a shotgun blast, came out, and saw Carter holding the shotgun. Pierre emotionally described how Schweinsberg lay on the hardwood floor, on her *47 back, head pointing south, in front of the couch. Pierre admitted that, in prior testimony, she had located the victim on the rug. When she returned from summoning help, Pierre said she saw the victim on the sofa, Carter wiping the gun with a towel and then wiping up blood on the floor. She stated that Carter placed the towel on the victim's back and then begged Pierre to take the blame because she was pregnant and would not get in trouble.
As Pierre sat in a holding cell at the police station, an Officer Gillen asked Pierre if he could help her. She declined. After a second inquiry, Pierre responded, "No, the police officer brought me in and told me to wait here." Gillen asked, "Well, what did you do." Pierre replied, "I shot a bitch's ass off." Gillen sought out Officer Byrd, who had transported Pierre, to ask if she had been "Mirandized." Byrd responded that she had, and Gillen had no further contact with her.
Detective Disalvo and Officer Boyd escorted Pierre and Carter to separate interview rooms in the detective division. As they encountered Officer Nelson carrying the shotgun, Pierre stated, "There is my shotgun." A fingerprint check of the gun, however, revealed only one latent print, which did not match Pierre's fingerprints.
Disalvo and Boyd interviewed Pierre. Disalvo read Pierre the Advice of Rights and Waiver of Rights form, which she signed. The officers engaged in no threatening or coercive behavior. Pierre cooperated and did not request an attorney. The officers conducted an oral interview to familiarize Pierre with the procedure, and then conducted a taped interview. Pierre remained calm and even jovial. The officers re-read Pierre her rights during the taped interview. Pierre described how she shot Schweinsberg in the back as the victim bent over Carter, asleep on the sofa.
After the interview, the officers and Pierre went into the detective division office, where Pierre sat at a desk and made a call to her brother, John Pierre. Disalvo sat at his desk, five feet away, with Boyd standing nearby. Boyd heard Pierre say on the phone, "I shot Kathy." According to Pierre and her brother, to whom she was speaking, she spoke words to the effect that she had been arrested or jailed for having shot Kathy. Pierre admitted on cross-examination, however, that in prior sworn testimony, she testified that she had told her brother that she had shot Kathy. During Pierre's phone conversation, Disalvo received a call informing him the victim had died. Disalvo told Pierre that she was under arrest for murder.
The next night, the defendant's brother, John, went to a lounge with Carter and some others. Carter seemed very depressed, and asked John to be sure Carter woke up the next morning. The next morning, John Pierre found Carter dead of a self-inflicted gunshot wound. Carter's bloodstream bore evidence of numerous drugs. Carter left a note which stated: "In Loving Memory of Kathy Schweinsberg. A person I will always love and cherish. May we meet each other in another time, another place. Rest in Peace. Love Always, Sherman." Beneath his signature, he recorded Schweinsberg's birth and death dates.
In early January of 1986, Pierre was released on bond. At that point she knew Sherman Carter had died. Pierre spoke with her good friend and Carter's first cousin, Theresa Carter. Pierre told Theresa Carter how Pierre had shot Schweinsberg as the victim leaned over Carter on the couch.
That month, Pierre and Theresa attended a gathering at Gregory Phillips' house. Pierre told Phillips that if he ever became involved in a shooting to call an ambulance, so he "could get out on bail that way." Phillips saw Pierre biting her nails, and Theresa Carter urged Pierre to recite her New Year's resolution. Pierre, without apparent humor, replied that she had resolved to stop biting her nails and "quit blowing people away." Pierre claimed that it was Theresa Carter who spoke and related Pierre's resolution to stop biting her nails and "stop giving blow jobs."
In August of 1986, cab-driver Loren Dingli gave Pierre a ride. Pierre told him the story of the shooting and said, "I shot *48 the bitch in the back and she deserved it." Pierre related that she should be able to "walk" by pinning the murder on Carter. During a cab ride a few days later, Pierre, without noting the time frame of events, complained that her boyfriend had killed himself, had "gone and left her anyway," and that no one cared for her. Dingli assumed that the boyfriend had just killed himself and did not even believe that a murder had taken place.
Deputy Sheriff Glen Roe met Dingli when Dingli was transferred from the Harrison County work center to the Biloxi jail. As Roe and Dingli talked, Dingli brought up the name of Loretta Pierre and asked if she were housed at the jail. As a result of the conversation the two had, Roe reported the conversation to the district attorney's office.
On May 14, 1986, a Harrison County grand jury indicted Loretta Pierre for the murder, with malice aforethought, of Kathleen Schweinsberg on December 21, 1985. After five mistrials for various reasons, the court transferred the venue to Warren County.[2]
In the pre-trial proceedings, the state moved to admit statements made by deceased eyewitness Sherman Carter. The state also moved to introduce the prior testimony of Theresa Carter, deceased.
On February 3, 1989, the jury found Pierre guilty of murder. The court sentence her to life imprisonment. Pierre moved for a new trial, alleging that the verdict lay against the overwhelming weight of the evidence. She alleged as errors that the court had improperly discharged a juror, had failed to accord her evidentiary hearings, and had improperly admitted inculpatory statements. The court denied the motion for new trial, and Pierre appealed.

II. ANALYSIS

A. Whether the prosecution overzealously prosecuted Pierre.
Loretta Pierre questions the justice and purpose behind her numerous trials, but offers no authority to support her contention that she has been inappropriately prosecuted. She mainly recites the procedural history of her many mistrials.
If an appellant fails to support her allegation of error with argument or authority, this Court need not consider the issue. Lambert v. State, 518 So.2d 621, 625 (Miss. 1987) (Court will not consider arguments unsupported by authority); Clark v. State, 503 So.2d 277, 280 (Miss. 1987); Hunter v. State, 489 So.2d 1086, 1090 (Miss. 1986); Kelly v. State, 463 So.2d 1070, 1072 (Miss. 1985). The judgment of the trial court is presumed to be correct and the appellant bears the burden "to demonstrate some reversible error to this Court." Edlin v. State, 533 So.2d 403, 410 (Miss. 1988), cert. denied, 489 U.S. 1086, 109 S.Ct. 1547, 103 L.Ed.2d 851 (1989).
Pierre offers no authoritative reason why the court should be held in error for having honored the state's decision to pursue a trial to completion. Cf. McGruder v. State, 454 So.2d 1310, 1311-12 (Miss. 1984) (discussion of prosecutorial vindictiveness). Since a mistrial "cannot stand in law," Black's Law Dictionary at 903 (5th ed. 1979), it represents a nullity and stands as no bar to continued prosecution. The issue lacks merit.

*49 B. Whether the trial court erred when it discharged a juror for cause over the objection of the defendant.

Pierre contends she was entitled to the services of a juror whom the court dismissed for cause after the court had sworn in the jury and excused the remaining venire members. Pierre cites no authority, claiming that the issue may be one of first impression.
The court dismissed the juror because he complained the case had given him stomach pains. Also, contrary to his answers on voir dire, the juror expressed reservations about his ability to fairly render a verdict. The defense asked for a mistrial and a new venire, or at least a supplementary venire. The court denied the motion for mistrial and seated the alternate juror. The court also refused to require a physical examination of the dismissed juror.
Under Mississippi law, excusing a juror for cause lies within the discretion of the trial court. Woodward v. State, 533 So.2d 418, 424 (Miss. 1988), cert. denied, Woodward v. Mississippi, 490 U.S. 1028, 109 S.Ct. 1767, 104 L.Ed.2d 202 (1989); Burt v. State, 493 So.2d 1325, 1327 (Miss. 1986). The general rule holds that the court may remove a juror for cause when a party has cause to challenge the juror's competency or impartiality. Woodward, 533 So.2d at 424.
Based on the record in this case, the trial court did not abuse its discretion in excusing the juror. The court noted that it found a particular disqualification in the juror's lack of candor during voir dire; the court expressed its opinion that the juror could not competently serve. Because, under Woodward, the court properly excused the juror, Pierre's unsupported complaint lacks merit.

C. Whether the trial court erred in denying the appellant's motion for mistrial when the state introduced testimony that the appellant signed an acknowledgement of her constitutional rights.
Pierre contends that, because the court had not made prior suppression ruling on the voluntariness of her Miranda waiver, Officer Boyd's testimony should have been grounds for mistrial. Even though the court immediately held a suppression hearing outside the jury's presence, Pierre argues that "the horse was already out of the barn." Pierre also contends, without any citation to authority, that the mention of her confession compelled her to object, which violated her fifth amendment rights. She also alleges the trial court erred by failing to make a finding that her waiver was intelligently given. On these grounds, she urges the trial court should have granted a mistrial.
The record reveals that Officer Ted Boyd presented a Miranda rights form to Pierre. The form included one place for a suspect to sign, indicating that she had been advised of her rights and another, indicating that she had waived those rights. At trial the district attorney asked Boyd, "After the waiver of rights was read to Ms. Pierre, what occurred next?" Officer Boyd replied, "After she was advised of her rights she signed it acknowledging the fact that she understood it. Myself and Detective ." (T. 481) (emphasis added). Defense counsel objected and requested a mistrial, which motion the court overruled. After a hearing outside the presence of the jury, the court concluded that Pierre had consciously, knowingly, and voluntarily given her statement.
The testimony to which Pierre objects, however, never took place. Thus, this issue bears no merit. Pierre claims that, before the court ever held a suppression hearing, Officer Boyd testified that Pierre waived her Miranda rights. He did not. He answered, "After she was advised of her rights she signed it, acknowledging the fact that she understood it." Boyd never testified, pre-suppression-hearing, that Pierre waived her Miranda rights; he testified that she acknowledged having understood them. Because Boyd's testimony makes no reference to Pierre's having waived her rights, no "horse was already out of the barn" and no merit appears in this issue.
*50 Pierre's second contention, that the mention of her confession violated her fifth amendment right to remain silent by compelling her to object, misstates the record. Boyd's pre-objection testimony did not include a reference to a confession. This allegation of error merits no further consideration.
The third complaint, that the court failed to make a finding of intelligent waiver, also misses the mark factually. While the court did not use the word "intelligent," the court found that Pierre made a "conscious" waiver. The court noted that Pierre's taped confession included her own requests for clarification of the officers' questions, exhibiting her ability to comprehend the interrogation process. The court implicitly, but unmistakably, found that Pierre intelligently waived her Miranda rights.
Pierre bases this issue on several misreadings of the record. She does not provide a sufficient factual predicate upon which to apply law. Her allegations of error fail.

D. Whether the trial court erred in the admission of confessions.
The trial court's finding of voluntariness will not be reversed by this Court unless the trial court committed manifest error or made its decision contrary to the overwhelming weight of the evidence. Chisolm v. State, 529 So.2d 630, 634 (Miss. 1988); Frost v. State, 483 So.2d 1345, 1350 (Miss. 1986); Gavin v. State, 473 So.2d 952, 955 (Miss. 1985). In its determination, the trial court must look to the state to prove the necessary facts beyond a reasonable doubt. Gavin, 473 So.2d at 954; see also Chisolm, 529 So.2d at 634; Neal v. State, 451 So.2d 743 (Miss. 1984), cert. denied, Neal v. Mississippi, 469 U.S. 1098, 105 S.Ct. 607, 83 L.Ed.2d 716.
The court, as the trier-of-fact, bears the duty to determine "whether there has been under the totality of the circumstances a knowing and voluntary waiver of the accused's privilege against self-incrimination." Gavin, 473 So.2d at 954 (emphasis in original); see also Chisolm, 529 So.2d at 634.

1. Whether the trial court erred in allowing into evidence the recorded confession made at the police department.
Pierre claims the state failed to prove the voluntariness of her waiver. (a) She alleges the police improperly questioned her after she had indicated her desire not to speak. (b) She alleges that she was denied the right to contact an attorney. (c) She alleges that the possibility of coercion lies in the amount of time she spent alone with Detective DiSalvo, whose testimony from another trial allegedly indicates a different length of time. (d) Pierre claims that, at the time of her confession, DiSalvo knew Schweinberg had died but failed to inform Pierre that a confession would implicate her in a murder.
During trial, the defense moved to suppress Pierre's in-custody statements. The judge declined to reconsider previous trial rulings on motions to suppress evidence. The judge asserted that he had the authority to rule anew on the admissibility of evidence.

(a) Whether the police improperly questioned Pierre after she indicated a desire not to speak.

In this case, the issue raised by Pierre arises from evidence adduced at a previous mistrial. In a 1986 mistrial, Officer Nelson stated: "After I had been on the scene several minutes I had placed Miss Pierre under arrest and advised her of her rights, and I asked her if she wanted to tell me anything as to what occurred out there and she just shook her head."
This issue is unreviewable. A party must first present an error to the trial court before the party may present it to this court. See Collins v. State, 594 So.2d 29, 36 (Miss. 1992) (citations). Pierre failed to preserve the issue for review in this trial.

*51 (b) Whether the police denied Pierre the right to contact an attorney.

Pierre alleges that she was "not allowed to use the telephone until `processing,' which included her taped statement, was complete." As a factual matter, nothing in the record shows that Pierre wanted to make a phone call at some earlier time or that the police denied her the opportunity to make a call. In Pierre's recorded confession, Detective DiSalvo began by advising Pierre of her right to an attorney or to stop questioning at any time to contact an attorney; she declined. When she did place a call, she called her brother, not an attorney; and nothing in the record shows that, even in calling her brother, she asked him to contact an attorney. This issue is built on hypothetical inferences drawn from the record and is of no merit.

(c) Whether the police coerced Pierre's confession.
Pierre contends that Detective DiSalvo could have coerced her during alleged time alone together in an interview room. Pierre cites testimony from an earlier trial to support this proposition and refers to the present record as containing "startlingly different testimony."
The record reveals that, in an earlier trial, the prosecutor asked Officer Boyd if Detective DiSalvo questioned Pierre before recording her statement. Boyd responded, "Not that I recall." By the time of the instant case, however, Boyd did recall that DiSalvo conducted an oral interview to familiarize Pierre with the process, after which she gave a taped statement.
Even assuming Boyd's testimonies present a discrepancy, Pierre makes an allegation with no factual basis to reach a conclusion that DiSalvo coerced Pierre. At the beginning and end of her confession, Detective DiSalvo asked, "Is [this statement] free and voluntary? I haven't promised you anything or beat you up, have I?" to which Pierre replied, "No, you haven't abused me."
She did not attempt to impeach Boyd on the stand. At no point in the record did Pierre ever state that she had been coerced. This issue fails.

(d) Whether the police improperly failed to notify Pierre of the charge against her.

During Pierre's interview, neither the interviewing officers nor Pierre yet knew of Schweinsberg's death. Pierre gave the police a statement relating to the aggravated assault charge. At trial, defense counsel argued that the authorities' failure to inform Pierre of Schweinsberg's death prior to Pierre's confession deprived Pierre of the ability to making a knowing waiver of rights.
In Harris v. State, 209 Miss. 102, 108, 46 So.2d 75, 77 (1950), a defendant confessed to assault and battery. When the victim died, the defendant was charged with murder. He contended that he gave the confession "under circumstances amounting to a misrepresentation of the charges ... in violation of the defendant's constitutional right to be informed of the nature of the charges against him" and that he had confessed to a crime other than the one for which the state tried him. The Court rejected the allegation and reasoned that a charge rests on events, and that a change in events does not vitiate a confession. Id. at 108-09, 46 So.2d at 78. The Court stated, "[T]he way defendants are constitutionally informed of criminal offenses against them is by means of the affidavit, information, or indictment, and not information from officers under the circumstances here." Id.
All testimony points unequivocally to the conclusion that the officers questioned Pierre before they learned of Schweinsberg's death. Under the law, the change in Schweinberg's condition leading to an elevation of the charge against Pierre does not vitiate the voluntariness of her confession. Thus, this issue lacks merit.

2. Whether the trial court erred in allowing into evidence without a hearing the confession Pierre made while on the telephone with her brother and which a police officer overheard.
Pierre urges that the trial court erred when it admitted Officer Boyd's testimony that he heard Pierre admit the crime while she spoke on a detective's office *52 phone to her brother, John. Pierre also claims that Boyd's act of listening and testifying violated Pierre's first amendment right to privacy and her fifth and fourteenth amendment right against self-incrimination.
"Custodial interrogation" occurs in "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 1611, 16 L.Ed.2d 694 (1966); see also Arizona v. Mauro, 481 U.S. 520, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987) (police did not conduct custodial interrogation when they tape-recorded defendant's conversation with his wife in the presence of an officer); Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (Miranda safeguards apply only during express police questioning or its functional equivalent). Although Pierre made the inculpatory statement while in custody, she did not make it in response to custodial interrogation or any police action designed to elicit a response. The interrogation had ended. Thus, the fifth amendment imposed on the trial court no need to ascertain voluntariness, knowledge, and intelligence of waiver.
As for the privacy one might expect in a telephone conversation in an open room with police officers nearby, the accepted law of search and seizure holds that one may only challenge an intrusion where one would objectively and reasonably expect privacy. Katz v. United States, 389 U.S. 347, 351-52, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967) (petitioner possessed a reasonable expectation of privacy in an enclosed, public telephone booth). Pierre could not reasonably have expected privacy when she conversed on a telephone in an open office a few feet from where two police officers sat.

3. Whether the trial court erred when it failed to grant the appellant an evidentiary hearing on a confession Pierre made to Loren Dingli, a cab driver.
Pierre claims that the trial court erred in admitting the testimony of Loren Dingli, a cab driver who testified he heard Pierre declare that she had committed the murder. She claims the court should have conducted a suppression hearing.
At trial, Dingli testified that he talked with a bartender about a 1986 fight Pierre had caused at the bar. The defense attempted to impeach Dingli with a newspaper account of a 1987 disruption Pierre caused at the bar. The court held a hearing to discuss the state's request to let the jury see the document with which the defense attempted to impeach Dingli. The defense sought the court's assurance that the jury not learn that Pierre's action, criminal in nature, led to the revocation of her bond. The court agreed. The court only allowed examination from the documents, "not getting into her saying that she's going to blow his head off, blow his brains out." The court maintained, however, that the state should have the chance to clear up confusion caused by the cross-examination.
On redirect, Dingli agreed that a certain document shown him detailed a 1987 incident involving Pierre at Terry's Lounge. Dingli testified, however, that in 1986, he had a conversation with a bartender about a completely separate incident involving Pierre at Terry's Lounge.
Pierre claims that she maintained a continuing objection to Dingli's testimony, but the objection does not appear on the record. Thus, she made no contemporaneous objection. See Miss.R.Evid. 103(a) (contemporaneous objection required to preserve error). She did not raise the issue until her motion for new trial, at which time she claimed that the court should have held a suppression hearing on the inculpatory statements. If Pierre had wanted to contest the admissibility of the evidence, she could have raised an objection at trial.
Pierre's contention that the court denied impeachment information to the jury also fails. The admissibility of evidence lies within the discretion of the court. In this case, the court carefully screened from the *53 jury testimony which would have been damaging to Pierre, that she reportedly threatened a bartender, and subsequently had her bail revoked. She demonstrates no reversible error.

E. Whether the trial court erred when it admitted a prior recorded statement of Sherman Carter.
Pierre alleges that the trial court committed error when it admitted a prior recorded statement of Sherman Carter, deceased. Pierre contends that the court admitted the statements in violation of the principle of res judicata and Mississippi's evidence Rule 804(b)(5), the unavailable-declarant catch-all exception to the rule prohibiting hearsay evidence.
Pierre cannot, however, rely on an admissibility ruling in a prior proceeding. Therefore, the principle of res judicata cannot apply here. Further, Pierre interposed no contemporaneous objection to the introduction of the evidence. Upon the state's motion to introduce the tape, State's Exhibit No. 33, Pierre's counsel voiced his lack of objection. Thus, Pierre failed to preserve this issue for review. See Lambert v. State, 518 So.2d 621, 625 (Miss. 1987); Miss. R.Evid. 103(a).

F. Whether the trial court erred when it refused to allow evidence of the victim's drug usage.
Pierre contends that the trial court erred in refusing to admit deposition testimony of Dr. Bennett describing the drug content of the victim's blood. Pierre claims that her six previous trials had included such evidence, which she claims supports her defense theory, that Sherman Carter committed the murder. Pierre maintains that Dr. Bennett's testimony of the drug usage of victim would have revealed part of the atmosphere in which the crime occurred and would have shown a motive for Carter to have murdered Schweinberg.
Before trial, the state moved in limine to prohibit any testimony describing the victim's character or prior acts, particularly testimony regarding drug and alcohol use. The court denied the motion, but stated that it would probably sustain a timely objection. In court, with the jury out, Judge Terry explained:
This trial is a new trial... . I'm not particularly inclined to sustain the Motion in Limine as such.... However, I have given the clear indication that it's my opinion that the testimony concerning the character of the victim, that at this time that is not a matter at issue and is not a matter that would be admissible under rule 404(a) or 404(b).
At trial, defense counsel asked Detective DiSalvo, "[Pierre] made mention of the fact that Kathy Schweinsberg was under the influence ... [of Demerol] as well." The court sustained the prosecution's objection to the question. Later, the court sustained the state's objection when the defense asked Dr. Bennett if he had performed a toxicology analysis on Schweinsberg's blood. In a subsequent hearing, the court excluded the victim's blood toxicology report. The court cited evidentiary rules on relevance and the weighing of probative value against other factors, Rule 403. See Miss.R.Evid. 401, 403. As a matter of fact, the court noted Dr. Bennett's testimony that the drugs would have induced nonaggressive behavior. Because Pierre raised no claim of self-defense or aggression by Schweinsberg, the court considered the victim's character not in issue.
The admissibility of evidence lies within the trial court's discretion, and this Court will not put the trial court in error unless the trial court abused its discretion. Here, the trial court thoroughly examined the evidence. Since the defense theory did not require an inquiry into the victim's character and since the proposed evidence bore significant prejudicial value, the trial court appropriately excluded it. See Spivey v. State, 58 Miss. 858 (1881) (character of victim irrelevant).

G. Whether the trial court erred in failing to grant a directed verdict or motion for new trial.
Pierre's brief summarizes her theory of the case:

*54 Loretta Pierre's defense at trial rested on the fact that Pierre was pregnant with Sherman Carter's child, and after Carter killed Kathleen Schweinsberg in a fit of rage, Carter begged Pierre to take the responsibility for his action in the belief that the prosecution would go lightly on a pregnant woman. By the time Carter killed himself, Pierre had incriminated herself past the point of no return. The Appellant would show that all of the circumstantial evidence in this case, as well as the statements made by both Pierre and Carter, support Appellant's claim of innocence. Essentially, it would have been physically impossible for Schweinsberg to have been shot the way Pierre and Carter stated to the police.
Pierre alleges that both the weight and the sufficiency of the evidence fail to support her conviction for murder and fail to corroborate her recanted confession and Sherman Carter's statement. Pierre cites the lack of fingerprints on the gun; the blood on the towel; the lack of blood on the floor, sofa, and Carter; "[t]he discrepancies" in firing range compared to room size, and soot deposits on the victim; and Schweinsberg's injuries.
If no reasonable hypothetical juror could have reached a guilty verdict, the defendant's motion for a directed verdict must result in discharge. May v. State, 460 So.2d 778, 780-81 (Miss. 1984). When this Court reviews a trial court's denial of a motion for directed verdict, the Court will give the state the benefit of all favorable inferences and then examine the evidence to be sure it supports the verdict beyond a reasonable doubt. Stever v. State, 503 So.2d 227, 230 (Miss. 1987).
The Supreme Court will reverse the trial court's denial of a motion for new trial only if, by denying, the trial court abused its discretion. Wetz v. State, 503 So.2d 803, 812 (Miss. 1987). A new trial should be granted only when the jury's verdict so contradicts "the overwhelming weight of the evidence that, to allow it to stand, would be to sanction an unconscionable injustice." Groseclose v. State, 440 So.2d 297, 300 (Miss. 1983); accord May v. State, 460 So.2d 778, 781-82 (Miss. 1984); Pearson v. State, 428 So.2d 1361, 1364 (Miss. 1983).
Regarding Pierre's motion for directed verdict, the trial court correctly ruled that sufficient evidence of the elements of the crime posed a question for the jury. Regarding her motion for new trial, the weight of the evidence supports the jury's verdict. Significantly, Pierre made numerous confessions and admissions, custodial and otherwise, consistently implicating herself. Although Pierre claims that she confessed only to exculpate Carter, she continued to implicate herself long after Carter had killed himself. She implicated herself in statements to Theresa Carter, Gregory Phillips, and Loren Dingli. Pierre attempted at trial to demonstrate that the blood at the scene and the expert testimony regarding firing range supported her version of events. Taking the evidence in a light most favorable to the verdict, the verdict was not against the overwhelming weight of the evidence. Thus, on grounds of evidentiary sufficiency to resist a motion for directed verdict and evidentiary weight to withstand a motion for new trial, this issue raises no error in the trial court's denial of both motions.

III. CONCLUSION
Finding no reversible error, this Court affirms.
CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE MISSISSIPPI DEPARTMENT OF CORRECTIONS ARE AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and ROBERTSON, SULLIVAN, PITTMAN, BANKS and McRAE, JJ., concur.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] On August 12, 1986, Judge Thomas entered the first mistrial order due to a week-long absence of two defense witnesses. (C.P. 48). Judge Thomas entered a second mistrial order on August 26, 1986, when the jury could not reach a verdict. (C.P. 49). The court entered a third mistrial order on September 29, 1986, "due to remarks made in the presence of the entire jury panel, which so prejudiced the jury as to make it impossible for the Defendant to thereafter receive a fair trial... ." (C.P. 63).

On April 9, 1987, Pierre moved to change the venue due to pretrial publicity arising from the case and the number of previous mistrials. (C.P. 67). Apparently, Judge Thomas denied the motion. On April 22, 1987, the jury could not reach a verdict and Judge Thomas declared a fourth mistrial. (C.P. 94).
Three months later, Judge Thomas declared a fifth mistrial due to the inability of the parties to select a jury "due to extensive pretrial publicity." (C.P. 114). Pierre successfully moved to change venue. (C.P. 113). This trial followed. See, generally, Miss.Unif.Crim.R.Circ.Ct.Prac. 5.15 (mistrial).